## 10406

### LESESNE v. ATLANTIC COAST LINE RAILROAD COMPANY.
#### (103 S. E. 147.)

1. CARRIER—RAILROAD TRANSPORTING COTTON HELD "COMMON CARRIER."
   —A railroad company which accepts from an initial carrier a ship-
   ment of cotton to be delivered on a point along its route, and trans-
   ports such cotton over its own tracks from the terminus of the initial
   carrier to the point of destination, is a common carrier, notwith-
   standing that its remuneration is received from the initial carrier
   alone.

2. CARRIERS—CONNECTING CARRIER NOT COMMON CARRIER IF SERVICES
   GRATUITOUS.—A connecting carrier is not subject to the liabilities
   of a common carrier, if its services are gratuitous.

3. CARRIERS—CARRIER HELD NOT LIABLE UNDER BILL OF LADING FOR
   INCREASED VALUE OF COTTON LOST IN TRANSIT.—Where a shipper
   delivers cotton to a common carrier for transportation, under a bill
   of lading providing that the amount of the carrier's liability for loss
   or damage was to be computed on the basis of the value of the cot-
   ton at the *bona fide* invoice price to the consignee, including
   freight charges if prepaid at the place and time of shipment, the
   shipper could not recover the increased value of the cotton since
   its loss, notwithstanding that he told the carrier that he intended
   to hold the cotton.

Before TOWNSEND, J., Sumter, Spring term, 1919. Affirmed.

Action by W. T. Lesesne against the Atlantic Coast Line Railroad Company and another. Judgment for plaintiff, and the named defendant appeals.

*Messrs. Mark Reynolds* and *Lucian W. McLemore,* for appellant. *Mr. McLemore* submits: *That the Atlantic Coast Line Railroad Company did not handle the cotton in ques-tion as a common carrier:* 6 Cyc. 365; 6 Cyc. 375; 9 S. C. 61; Hutchison on Carriers, 2d Edition, sec. 157; 81 Ga. 522; 7 S. E. 916. *The Court below erred in its construc-tion of the contractual relation between the two railroads, in holding that the Coast Line handled the cotton as agent of the Northwestern:* Elliott on Railroads (3d Ed.), sec.

451; 61 Fed. 605; 37 L. R. A. 33; 14 Pick. 1; 25 Am. Dec. 350; L. R. 2 C. P. 205. *As to measure of damages—anticipated profits cannot be recovered where they are dependent upon uncertain and changing conditions, such as market fluctuations, or the chances of business:* 17 Corpus Juris, sec. 112, p. 787.

*Messrs. L. D. Jennings* and *A. S. Harby,* for respondent, submit: *Was the Atlantic Coast Line Railroad Company a connecting carrier?* Civil Code 1912, secs. 2574-5; 96 S. C. 357. *The Atlantic Coast Line Railroad Company was a common carrier in regard to the shipping public:* Constitution of 1895, art. IX, sec. 3; 94 Kan. 96; 145 Pac. 831; L. R. A. 1918b, 680; 226 U. S. 286; 57 L. Ed. 226, and note; L. R. A. 1918b, 684. *The contract in question amounts to nothing more than a lease of a portion of the A. C. L. Company's track to the Northwestern Railroad:* . 35 S. C. 216; 28 S. C. 401; 75 S. C. 162, and cases therein cited. *The liability of a lessor railroad company extends to actions ex contractu as well as actions ex delicto:* 35 S. C. 216; 28 S. C. 401; 44 L. R. A. 737 (note); 59 Kan. 629. *As to his Honor submitting questions to the jury and instructing them to render special findings thereon:* Code of Procedure, sec. 321; 99 S. C. 197; 88 S. C. 193.

May 12, 1920.

The opinion of the Court was delivered by MR. JUSTICE GAGE.

The plaintiff had a verdict and judgment against the two defendants, and the first named defendant has appealed therefrom.

The action arose out of the loss under the following recited circumstances, all admittedly true, of 10 bales out of a total shipment of 888 bales of cotton from a station called Silver to the city of Sumter. Silver is a station 18 miles south of Sumter on the line of the Northwestern Rail-

road Company.   The railroad terminates a short distance
south of the city of Sumter; thence the cotton was carried
over the track of the Atlantic Coast Line Railroad Com-
pany, by the engine, cars, and crew of that company, into
the city; and thence over other tracks of the Coast Line and
by the same agencies one mile to Rowland's Warehouse.
Many of the 888 bales so shipped were unloaded on the cot-
ton platform of the Coast Line in the city of Sumter; they
were kept there over 30 days; they were then reloaded and
carried to Rowland's Warehouse.   All the 888 bales came
into the hands of the Coast Line; but only 878 bales were
delivered to Rowland's Warehouse.

  The Coast Line's principal contention is that, being sued
solely as a common carrier for the loss of the cotton, it can-
not be held liable unless it appears that it sustained toward
plaintiff the relation of a common carrier; and, as growing
out of this contention, its further position is that in this
action it cannot be held liable upon any theory that as agent
for its codefendant it negligently lost the cotton.   And
these two issues have been argued under three heads, to
wit:

  "(1) There was no evidence that Atlantic Coast Line
Railroad Company undertook as a common carrier to han-
dle the cotton; (2) the Court below erred in submitting to
the jury the question if Atlantic Coast Line Railroad Com-
pany, as agent of the Northwestern Railroad Company of
South Carolina, was liable for negligently losing the cotton;
(3) the Court below erred in its construction of the con-
tractual relation between the two railroads in holding that
Atlantic Coast Line Railroad Company handled the cotton
as agent of the Northwestern Railroad Company."

  It is true that the Coast Line is sued as a common car-
rier; and the testimony fixes its character as such.

  The contract betwixt the shipper and the initial carrier,
he Northwestern, evidenced by the bill of lading does not

8—S. C. 114

indicate the destination of the shipment, nor does it indicate that the initial carrier and the shipper agreed that the shipment was to be delivered to the Coast Line on the route to its destination. The parol testimony, which is uncontradicted, shows that the Coast Line's crew and cars carried the cotton over the Coast Line's tracks from the terminus of the Northwestern into the city of Sumter, unloaded the cotton there on the Coast Line's cotton platform, and some weeks thereafter reloaded the cotton into the Coast Line's cars and carried it by the Coast Line's crew and engine over the Coast Line's tracks to Rowland's Warehouse.

Nothing else appearing, this conduct by the Coast Line fixes its character as that of a common carrier. But it is contended: (1) That the evidence shows that the Coast Line got no part of the freight charges which were paid by the shipper, all of which went to the Northwestern, and that such circumstances robbed it of the character of a common carrier; and (2) that when the Coast Line did the recited service it was acting, not as a connecting carrier, but was only lending to the Northwestern a "transfer of service," as some such relationships have been defined. These two contentions will be dealt with in inverse order.

The testimony shows that the Northwestern had no agency to carry the cotton further than its before described terminus; and for that reason it had a general contract with the Coast Line for the "joint use of that portion of its main track and yard tracks within the switching limits of Sumter, together with the yard space facilities, depots, freight and passenger, freight houses, and other joint facilities located at Sumter; that is to say, to cover joint use with the said Coast Line Company of all the facilities heretofore used jointly by the two companies prior to the date of this agreement." For such joint use the Northwestern agreed to pay the Coast Line $400 per month. There is no testi-

mony, however, which tends to show that the Northwestern was at the instant jointly using the terminals in question; all the testimony shows that the Coast Line was using them.

But the appellant contends that when the crew and cars of the Coast Line carried the cotton the act was that of the Northwestern operating the "transfer service" of the Coast Line.

There is no testimony which tends to show that. The contract does not provide for the joint use of cars and engines and crews. It is true that the instrument refers to "other facilities," but the plain intent of the whole contract was to create a joint use of the agencies which the Northwestern did not have, to wit, tracks and depots, freight and passenger.

It is true that the Coast Line is not subject to the liabilities of a common carrier if its service was gratuitous But it is not pretended that the service was gratuitous.

The Coast Line may not have got a part of the freight charges which the plaintiff paid the Northwestern; but it got $400 a month from the Northwestern for a service the Northwestern could not do, and which the Coast Line could do, and which it undertook to do. The plaintiff, however, is not satisfied with the measure of his damages meted out by the Court; he wants to recover the increased value of the cotton since its loss.

The judgment of the trial Court thereabout was right. The contract between the shipper and the initial carrier definitely fixed the damage to be recovered in these words:

The amount of any loss of damage for which any carrier is liable shall be computed on the basis of the value of the property (being the *bona fide* invoice price, if any, to the consignee, including the freight charges, if prepaid) at the place and time of shipment under this bill of lading. And the circumstances that the plaintiff told

the carrier at the time of shipment that he intended to hold the cotton does not modify the plain contract of the parties.

The Northwestern excepted because the Court submitted to the jury at all the liability of that company to the plaintiff, when the only reasonable conclusion to be had from the testimony is that the loss is chargeable solely to the Coast Line.

The jury found a general verdict against both companies. The Court accepted the verdict, and judgment has been entered thereon, and the Northwestern did not appeal. The exception, therefore, need not be considered.*

The judgment is affirmed.